14256

RHAME v. PACIFIC MUTUAL LIFE INSURANCE CO. OF
CALIFORNIA

(184 S. E., 685)

*Messrs. Thomas, Lumpkin & Cain* and *William P. Baskin, Jr.,* for appellant,

*Mr. Henry C. Jennings,* for respondent,

March 16, 1936.

The opinion of the Court was delivered by Mr. Justice Carter.

This action by John M. Rhame, as plaintiff, against the defendant, the Pacific Mutual Life Insurance Company of California, was commenced in the Court of Common Pleas for Lee County, this State, July 14, 1933, for the purpose of recovering from the defendant the sum of $1,700.00, actual and punitive damages, alleged to have been sustained as the result of the wrongful breach of a contract of insurance issued by the defendant to the plaintiff, which breach of contract the plaintiff alleged to have been accompanied and caused by the fraudulent acts of the defendant. In this connection we call attention to certain of the allegations set forth in the plaintiff's complaint.

The defendant, the Pacific Mutual Life Insurance Company, as alleged by the plaintiff, is a corporation under the laws of the State of California, and is engaged in the business of issuing and selling life and disability insurance policies in the various counties of the State of South Carolina, including the County of Lee, of which county the plaintiff is a resident, where this action was instituted, and is licensed to do business in this State; that in the year 1925, for valuable consideration the defendant "issued and delivered to the plaintiff a non-cancellable income policy, wherein and whereby the said defendant agreed, in consideration of the annual premium paid to it by the plaintiff as stated in said policy, to insure the said plaintiff against disability commencing while said policy was in force and resulting from sickness, and agreed to pay indemnity to the plaintiff at the rate of One Hundred ($100.00) Dollars per month for the period throughout which said disability consisted of continuous, necessary and total loss of all business time, except that no indemnity should be paid for the first three months of any total loss of business time; that some time during the

month of September, 1930, the plaintiff became totally disabled from sickness and since that time has suffered total loss of all business time. That after plaintiff became so disabled he notified the defendant and furnished them proofs of disability as provided by said policy, and that thereafter, on or about December 26, 1930, pursuant to the requirements of said policy, the defendant commenced paying said plaintiff the sum of One Hundred ($100.00) Dollars per month and continued said payments to August 26, 1931"; thereafter, as alleged by the plaintiff, on or about October 8, 1931, the defendant, through its agent, in violation of the said policy contract, and for the purpose of defrauding this plaintiff out of the benefits to him under the provisions of said policy and while the plaintiff "was sick and weak and suffering great pain, and was highly nervous and unable to think clearly, and was under the influence of drugs to relieve his suffering, and was in a physical and mental condition rendering him easily excited and inflamed and misled and overreached, all of which was known to the defendant, and seized upon by the defendant to swindle him out of the benefits of said policy, and for the purpose of cheating and defrauding the plaintiff out of the same and to save itself from complying with the requirements thereof, the defendant sent its agent to the home of the plaintiff, and did falsely, knowingly, designedly, wickedly and with the intent to deceive the plaintiff, state to him that there was some little trouble with the policy and he would like to see it a moment." It is the further contention of the plaintiff, according to the allegations set forth in his complaint, that after the defendant, through its agent, got possession of the policy in question, defendant's agent, in effect, stated to the plaintiff that the defendant would not continue to pay the policy for the reason that the company would not have issued the same if the company had known of the previous illness of the plaintiff; that the plaintiff thereupon informed such agent, in effect, that he had related his true condition when he ap-

plied for insurance and, further, that the defendant could have obtained full information concerning his hospital record from the company which he had previously applied to for insurance. It is the further contention of the plaintiff, as set forth in his complaint, that the said agent of the defendant gave various reasons why he could not recover anything from the defendant, if litigation was resorted to, and in plaintiff's physical condition, above described, he was taken advantage of by said agent and, in effect, forced to sign a release in the sum of $1,200.00. In this connection the plaintiff further alleges that the said agent, in the course of said conversation, stated to the plaintiff that he (the plaintiff) had made certain misrepresentations in the application for the policy in question and that, therefore, the plaintiff could not recover anything. Being in the weak and disabled condition above described, the plaintiff was unable to protect himself under the conditions and signed the release as above stated; that the statements thus made by the said agent to the plaintiff were not only false, but known by the said agent and defendant to be false, and that the said statements were made by the said agent for the purpose "of so charging the mind of the plaintiff with false fear and so completely destroying his confidence in the security of his contract that he would be under the merciless domination of the company and willing to settle at the company's figures, all of which purpose, acts and statements were grossly fraudulent"; that according to the plaintiff's allegations contained in his complaint, after the defendant had procured the said fraudulent settlement with the plaintiff, the defendant ceased to pay the said monthly installments due the plaintiff under the said policy contract and has made no payment to the plaintiff since that time; and that the defendant is due the plaintiff, as damages growing out of said transaction, the said amount alleged.

In its answer the defendant denied all material allegations of the complaint and alleged that the contract of insurance

in question was freely and voluntarily surrendered up by the plaintiff for a valuable consideration, namely, the sum of $1,200.00. The defendant further interposes the defense that the plaintiff duly executed a release and delivered the same to the defendant as a full and complete settlement of the action. In this connection we call attention to the following allegation set forth in the defendant's answer: "This defendant alleges that the said plaintiff freely and voluntarily, and of his own volition and accord, executed and delivered the foregoing release to this defendant and surrendered the said policy of insurance to it for cancellation, for the above-mentioned consideration, and this defendant emphatically denies that such release was obtained or the surrender of the policy effected through any misrepresentations, fraud or deceit on its part, and denied that it was guilty of any unlawful or fraudulent practices in connection therewith. This defendant therefore alleges that the said plaintiff is now precluded and estopped from asserting or claiming any further rights, demands or benefits under and by reason of said contract of insurance, and pleads said release as a full and complete bar to the further prosecution of this action."

Issues being joined, the case was tried at the spring, 1934, term of Court for said county, before Hon. J. Henry Johnson, and a jury. At the conclusion of the plaintiff's testimony the defendant made a motion for a nonsuit. This motion being overruled, the defendant offered testimony, and at the conclusion of all the testimony motion was made by the defendant for direction of a verdict. This motion was also refused and the case duly submitted to the jury by the trial Judge, resulting in a verdict for the plaintiff against the defendant in the sum of $1,000.00 actual damages and the sum of $700.00 punitive damages. The record further discloses that upon the publication of the verdict of the jury the defendant renewed its motions for nonsuit and direction of a verdict, the same being overruled. From judgment en-

tered on the verdict the defendant duly appealed to this Court.

The allegations of error imputed to the trial Judge by appellant are set forth under seven exceptions, but counsel for appellant state that there are only three questions involved by the appeal, namely:

"1. Was the release executed by the plaintiff as his free and voluntarily act?

"2. Did the defendant make any wrongful or fraudulent representations in order to induce the execution of the release?

"3. Does the release constitute a full and complete bar to the prosecution of this action?"

These questions will be considered together.

For the purpose of passing upon the questions presented by appellant, it is, under our view of the case, not necessary to quote or discuss the testimony at length. We think it sufficient to state that there was testimony introduced on behalf of the plaintiff tending to establish all material allegations set forth in his complaint, and that the above questions stated by appellant as being raised by the exceptions, must be answered against appellant's contentions; that while there was testimony introduced on behalf of the defendant in conflict with that introduced on behalf of the plaintiff, on the issues raised by the pleadings, said testimony, in our opinion, simply served to raise an issue for the jury and furnish no ground for granting defendant's motions for a nonsuit or direction of a verdict. However, we will call attention to some of the testimony adduced at the trial. In this connection we quote certain testimony of the plaintiff. Stating that he was forty-three years old and had been living at Bishopville for thirty-two years, in the course of his examination he gave the following answers to questions presented to him:

"Q. Some time during the year 1925, did you take out a policy of insurance with the Pacific Mutual Life Insurance Company? A. Yes, sir.

"Q. What type of policy was this? A. It was a non-cancellable accident and sickness policy, paid me for temporary illness or disability, but after ninety days payment began if you were totally disabled.

"Q. At what rate? A. About $26.00 a year.

"Q. You misunderstood me, at what rate were the disability payments? A. $100.00 a month for total disability, with an exemption of ninety days.

"Q. What was the annual premium charged? A. About $26.00 a year.

"Q. How long did you pay premiums on that policy? A. Seven years.

"Q. What happened to you about September, 1930? A. About that time I had suffered pains in my side and back, and about the 26th of September I was unable to stand up or work any longer. I went to bed, was treated by a physician locally, and in the latter part of November or the first of December, I went to the Government hospital in Atlanta, Georgia, was treated there about two months, returned home, and was ill continuously from then on.

"Q. What did you do in connection with your policy? A. About the latter part of December I notified the agent of the Pacific Mutual that I had been disabled for ninety days, and could furnish proof of disability, and under the policy I was entitled to payments.

"Q. What did they do in response to that notice? A. They began paying the latter part of December, $100.00 a month.

"Q. How long did they continue the payments? A. Until August 26th, 1931.

"Q. Has your condition got any better, have you recovered from your illness? A. I have not recovered entirely, but I am much better than I was three years ago or even a year ago.

"Q. Are you able to engage in any work whatever? A. I have not done a day's work since September 26th, 1930.

"Q. Are you able to do any work? A. No, sir.

"Q. Did you ever see this gentleman sitting here? A. Yes, sir.

"Q. What is his name? A. Mr. Mitchell.

"Q. What was the occasion of your first contract with him? A. Some time in the early spring of 1931, Mr. Mitchell was not the first agent for the company who came around, but about that time he came to see me several times.

"Q. Where? A. At my home. And he called as the agent for the Pacific Mutual, I suppose, to see if I was working or not working, anyway he was in the house several times and there was no especial discussion about the policy, he said he wanted to know how I was getting on, if everything was all right, and if the checks were coming properly.

"Q. Did he, in any of the visits you are speaking of now, make any indication to you that there was anything, any dissatisfaction about the company continuing the payments? A. None whatever.

"Q. Now, about October 8th, 1931, did Mr. Mitchell call on you again? A. He did.

"Q. Where? A. At my home.

"Q. Were you alone, was somebody with you when he first approached you? A. I was alone, about ten-thirty in the morning, I was on the front porch in pajamas, and bath robe, I had been especially in pain that night, and that morning, and I was laying in this chair, I think, at that time.

"Q. You say you were in pain? A. Yes, sir; I had eased enough from the medicine I had taken the night before to get out in the sunshine.

"Q. When did this severe pain come on you? A. I have had pain continuously almost all the time, but severe paroxysms all that night before, and until five o'clock that morning, I had been taking medicine to relieve the severity of it. I had been up since five o'clock in the morning. I had been in the bed. * * *

"Q. Did you sleep any the night before? A. Very little.

"Q. What medicine had you been taking? A. I had taken medicine prescribed by the physician, codeine and salicytates. * * *

"Q. Are you a druggist? A. Yes, sir.

"Q. How long have you been a druggist? A. About twenty years.

"Q. About how long prior to October, 1931, had you been taking these medicines under the orders of the doctor? A. I had been taking them since September, 1930, that and various other medicines, whatever they happened to prescribe at the time.

"Q. Do you know what medicines you were taking? A. Yes, sir.

"Q. In what quantities had you taken them that morning? A. I had taken two doses of amidophene, capsules, and two doses of codeine later on.

"Q. Could you feel the effects of those drugs? A. Yes, sir; it relieved the pain.

"Q. Do you know the effect that those drugs have upon a person taking them? A. The amidophene and codeine both relieve pain. * * *

"Q. All right, go ahead and testify what effect they have. A. I might say that it is no secret, I believe it is in practically every textbook in medicine, the effect of amidophene and codeine, they are given to relieve pain, and the effect in relieving the pain is to relieve the entire nervous system and act as an anesthetic, a sedative, to bring about a feeling of well being and lassitude, and one under the effect of the drugs is not normal but you are not in excessive pain. It tends to quiet you, to make you sleepy and listless.

"Q. What effect does it have on a person's power of resistance? A. The codeine and hyocine both lower the resistance.

"Q. Did you take any amatol at that time? A. At that time they used amatol compound occasionally, I don't recall

whether I took that that morning or not. They authorized the drugs from time time.

"Q. *Did you take any of the drugs in the presence of Mr. Mitchell that morning?* A. *Yes, sir.*

"Q. Who brought them to you? A. My wife.

"Q. *Why did you take them?* A. *I was in severe pain.*

"Q. *Were you exhibiting any evidences of your painful condition in his presence?* A. *Almost the first thing he asked was how I was feeling, and I told him I had had a particularly bad night, and a good deal of pain, and I had been taking medicines until I felt that the pain was easier.*

"Q. Well, go ahead and tell the Court and jury what transpired between you and Mr. Mitchell. What was said and done? A. I was lying on the porch, and Mr. Mitchell came there, he had been several times, I knew him, the visits had been very pleasant before, and he came and asked how I was, I told him, as a matter of fact, I was just back from the hospital, I had been back about a week, but I had received no benefit from that stay in the hospital, I had a great deal of pain, and I had taken considerable medicine that morning, and I told him the check was due to come that morning, it was about a week late, and I hoped he had brought it with him. He said no, there is a little catch about the policy, I would like to look at it a moment, and I said all right, I came into the house, got the policy and brought it back and handed it to him. He took the policy, looked at it and says here is the trouble, now my company is not going to pay you any longer on this policy, he said, they would not have issued this policy, we find that you were ill in the army, and we would not have issued the policy if we had known you had this sickness."

It further appears from the testimony that the agent referred to stated to the plaintiff at the time of the conversation that it made no difference if the premiums on the policy had been paid for 25 years; that that would not be of any

avail to the plaintiff. During the interview referred to, which lasted for some time, the plaintiff became very weak and the pain suffered by him was evident, and during this time the plaintiff requested his wife to bring him one-half grain cocaine, which he took in the presence of the agent, for the purpose of trying to ease his pain. In this connection it is also well to mention the fact that according to plaintiff's testimony he thought at the time of this interview that the said agent was trying to be of help to the plaintiff, and in that way it seems he got into the good graces of the plaintiff, and in this way was able to influence the plaintiff. It also appears from the testimony that the said agent led the plaintiff to believe that the insurance company would likely be displeased with his report and would not be willing to abide by the settlement that he (the agent), was then making with the plaintiff, and would very likely bring a suit to recover the payments the insurance company had already made to the plaintiff. In this connection the record disclosed the following statement of plaintiff of what took place during the interview referred to : "I told him that would be very unfair and unjust, and I told him it is a terrible shame, I have paid the policy for seven years, and now, when I am ill physically, cannot work, and in no physical or mental condition to talk about going to Court, and you know this is all I have for myself and family to live on, and you are taking advantage of me. And he said, the only thing I can do is to offer to pay you a lump sum, and he said further, after he heard from the company's home office, they would probably object to that, but that he had authority to settle cases that way, and if I would close at once it would probably go through all right. The conversation went on about that strain, and for probably thirty or forty minutes, I objected to it, told him I thought they were taking advantage of me and my wife, stated it looks like they are taking advantage of me because of my physical and mental condition. I told him I was in no shape, as he could easily see, mentally or physically, to go to

Court, and it would be impossible for me to get in a Court room."

The plaintiff also stated, in the course of his testimony, that the agent stated to him that in case of a lawsuit "the Judge would not let it go to a jury, and he stated further, we have a staff of high price lawyers, we can keep this case in the Court room a year, and if you win, which is improbable, we could appeal it and you would still be another year in the Supreme Court." In the course of his testimony the plaintiff further testified, in answer to questions on this line, as follows:

"Q. What did he say, if anything, about losing the suit, if another suit would be brought? A. You understand, Mr. Mitchell was very pleasant, and as I said, it looked to me, it was probably the condition I was in at the time, and the effect of the drugs, but it looked to me like he was trying to help me, and he went on and said, suppose you do win the suit, and we paid this for the next month, we could force you to bring another suit and if we paid that we could force you to bring another suit for the next month.

"Q. Did they put a time limit on your accepting the offer made? A. In the conversation my wife and I both said that it had come so sudden and I was not physically or mentally able to make any decision reasonably about anything. I had not transacted any business in nearly a year, and he stressed the point that what was done would have to be done right away, because when he heard from the home office that would alter conditions entirely.

"Q. What did he say in connection with the amount he would be willing to pay? A. He said that they had experience with numbers of cases like this, and usually they paid about the amount it would cost them in Court costs, and so forth, and usually in settling a claim of this kind they paid for one year. In larger cases, where the publicity amounted to something, they would pay two or three years."

After a careful study of the entire record, we do not hesitate to state that, in our opinion, the testimony in the record was sufficient to take the issues, raised by the pleadings, to the jury. The testimony introduced on behalf of the plaintiff tends to establish the issues according to the plaintiff's viewpoint, and the testimony introduced on behalf of the defendant tends to establish the issues according to the defendant's viewpoint. It was, therefore, proper for the trial Judge to refuse the defendant's motions for nonsuit and direction of a verdict. In our opinion, the testimony was susceptible of the inference that the plaintiff did not execute the release in question freely and voluntarily, but was induced to execute the said release by reason of the wrongful and fraudulent representations made by the defendant and its agents while he (the plaintiff), was in a weakened condition, and unable to take care of his interests. We think, under the circumstances of the case, as disclosed by the testimony, it was proper for the trial Judge to submit all of the issues to the jury and permit the jury to say whether or not the release in question was executed under the conditions contended by the plaintiff or issued under the conditions contended by the defendant. As we view the testimony, it was the province of the jury to say whether the release in question constituted a full and complete bar to the prosecution of this action; and the jury having answered the question against the appellant's contention, the exceptions must be overruled.

It is therefore the judgment of this Court that the judgment of the Circuit Court be; and the same is hereby, affirmed.

MR. CHIEF JUSTICE STABLER, MR. JUSTICE BONHAM and MESSRS. ACTING ASSOCIATE JUSTICES WM. H. GRIMBALL and G. B. GREENE concur.

MR. WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE (concurring) : It seems to me that this case is controlled by the principles announced by this Court in the case of

*Koon v. Pioneer-Pyramid Life Ins. Co.,* 175 S. C., 117, 178 S. E., 503.

*Koon's case* was decided by this Court some months after the present case was tried on circuit. On facts very similar to those of the present case, this Court decided that, in that case, "the trial Judge properly submitted the question to the jury."